**YANKTON SIOUX TRIBE, and its individual members, Plaintiffs,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS; Joe N. Ballard, Chief Engineer, Army Corps of Engineers; Tom Curran, Operations Manager, Army Corps of Engineers Fort Randall Project; and John Doe, past Chief Engineer, Army Corps of Engineers, Defendants.**

No. Civ. 99–4228.

United States District Court,
D. South Dakota,
Southern Division.

Jan. 10, 2000.

Mary Turgeon Wynne, Okanogan, WA, for plaintiffs.

Bonnie P. Ulrich, U.S. Attorney's Office, Sioux Falls, SD, for defendants.

# MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

The Yankton Sioux Tribe, a federally recognized Indian Tribe (the "Tribe"), brought this lawsuit to protect what appear to be Native American human remains on the shore of Lake Francis Case (the "Lake") behind Fort Randall Dam. Through its complaint, the Tribe seeks a preliminary injunction preventing defendant, the United States Army Corps of Engineers (the "Corps") and its officers, agents and employees, and all those in active concert or participation with the Corps, from allowing the water level in the Lake to rise above its current level. The Tribe also seeks a permanent injunction affording the same relief or, in the alternative, a writ of mandamus directing the Corps to prevent the water level from rising and to notify the Tribe that the human remains have been discovered. On December 23, 1999, the Court entered a Temporary Restraining Order preventing the Corps and its officers, agents, servants, employees, attorneys and all other persons in active concert or participation with it, including named defendants Joe N. Ballard and Tom Curran, from raising the water level at the Lake higher than 1340.3 feet above sea level. A hearing on the Tribe's motion for a preliminary injunction was held on January 3–4, 2000.

## FACTS

The cemetery at White Swan Church, also known as St. Phillip's Cemetery, predates Lake Francis Case. One witness testified that the cemetery was established in 1892. The Corps' Report on Plan of Cemetery Relocations (the "Relocation Plan"), filed with this Court in 1950, indicates that the marked graves in the cemetery dated back to 1869.[1] Documents introduced by the Corps indicate that the Episcopal

---

1. The Court takes judicial notice of the facts contained in the Relocation Plan and the rest of the court documents filed with this Court in the same proceeding, *United States v.* *1766.87 Acres of Land,* Civil No. 626 (D.S.D. 1949). A copy of the Relocation Plan will be included with the court file in this case.

Chapel of St. Phillip the Deacon, located next to the grave site, was reserved for religious purposes in 1894. (Ex. B.) It seems likely that the Chapel was in existence before that date. The oral history of the Tribe holds that the grave site adjacent to the church has been used for the burial of tribal members since at least the early nineteen hundreds. According to affidavits supplied by members of the Tribe, nearly all of the dead buried in the cemetery were "Sioux Tribal" members. (Drapeau Aff. at 2; Spotted Eagle Aff. at 1.) In addition, according to the same affidavits, the Yankton Sioux have buried their dead in the area of the church, though not necessarily on the cemetery site, since before the graveyard was founded, since at least 1838, and possibly from prehistoric times.

In 1949, the United States filed a petition to condemn the property containing the cemetery in order to allow the construction of Fort Randall Dam and Lake Francis Case.[2] In 1950, as part of the condemnation proceedings, the government obtained an order authorizing the United States, "at its own expense, to disinter, remove and reinter the bodies of all persons buried [in the cemetery]." Under this order, the removal was to be carried out pursuant to the Relocation Plan, which was filed in those same proceedings. Through the Relocation Plan, the Corps took responsibility for the disinterment, removal, and reinterment of the burials that would be inundated by the Lake, and made a self-described "intensive effort" to locate burial sites, determine the identity of the persons buried there, and learn of relatives' wishes regarding reinterment. (Relocation Plan, Ex. A.) The Relocation Plan provides the following history and assessment of the cemetery:

> The first Episcopal Church was established on this tract in 1871 and the first burials in the cemetery date back to about 1869 according to the dates of death shown on the monuments and information obtained from old residents of

the area. The official church records at Greenwood, S.D., show that the first Indian was buried in the cemetery in 1874. According to the church records, approximately 150 burials were made between 1874 and 1900 but no record is shown of any burials in 1875 and 1881 so no doubt many were not recorded and the location of some of these graves is unknown. There are 54 monuments marking the location of this number of Indian people buried before the turn of the century. Of the 428 graves found in the cemetery, 185 have monuments or white wooden crosses identifying the people buried; the remaining 234 have not as yet been marked with the names of the people buried but after the Land Field agent had consulted a considerable number of relatives, it was discovered that the majority of the graves could be identified and the Indian relatives agreed to mark the graves in a manner so that they could be identified. All of the unidentified graves are either mounded up or are marked by stakes at the head of each grave.

(Id.) Under the Relocation Plan, the Corps contracted for the removal of the bodies buried at the cemetery to a new St. Phillips Cemetery in Lake Andes, South Dakota. The Corps failed to effect the removal and reburial of all of the bodies in the cemetery.

Due to the construction of Fort Randall Dam and the Corps' management of the Lake, the land on which the cemetery sits is now covered by lake water for a part of every year. According to a map of the cemetery contained in the Relocation Plan, the cemetery rests on land which ranges in elevation from 1343 to 1347 feet above sea level. A map surveyed and drawn by Corps employees in December 1999 shows that most of the remains are located along a line 1340.6 feet above sea level. (An estimated loss of three to four feet in soil since the creation of the Lake may explain

---

**2.** The petition, part of Civil No. 626, was dismissed in 1953 upon the government's mo-

tion, and its representation that the land had been acquired by direct purchase.

both the drop in elevation and the exposure of human remains at the site.) The Corps' Annual Operating Plan currently calls for the Lake's water level, pursuant to projected median runoff, to fluctuate between a peak of 1355.2 feet above sea level maintained from March 31 through August 31, and a valley of 1337.5 feet on November 30. The Corps' planned increase in the water level to 1343.5 feet by the end of December 1999, 1347.0 feet by the end of January 2000, and 1350.0 feet by the end of February 2000, would completely inundate the site.

The Corps' adjustment of the water levels is designed to serve the multiple purposes set forth in the Flood Control Act of 1944, including flood control, irrigation, power supply, navigation, and recreation. The winter and spring increase in the water level at the Lake allows the Corps to generate additional hydroelectric power. If the water level does not rise as planned, approximately 150 gigawatt hours of additional anticipated power are predicted to be lost in January and February 2000 alone. The Western Area Power Association ("WAPA"), part of the United States Department of Energy, usually purchases this power on a firm basis from the Corps. Stan Mason, a Systems Operations Manager at WAPA, testified that WAPA would lose an approximate total of $3.8 million in an average January and February if it had to purchase power from other sources on the open market. (So far, temperatures have been milder than average, which will reduce WAPA's estimated loss.) The winter increase also allows the Corps to reduce water levels at upstream reservoirs as part of the Corps' effort to prevent flooding by capturing runoff from spring rains and melting snow packs in the mountains and northern plains. The autumn decrease in water levels creates a "hole" in the Lake which, as it uncovers the grave site in late fall and early winter, also supplies the Corps with storage capacity to accept additional water from the upstream reservoirs as part of the Corps' flood-control plan. It is clear that requiring the Corps to maintain the water in Lake Francis Case at its current level for an extended period of time would interfere with its plans for power generation, flood control, and the other objectives of the Flood Control Act. It is not clear, however, to what extent the Corps could compensate for any resultant loss in its capacity for power generation or flood control by changing its plans and adjusting its operations at other dams in the Main Stem System.[3]

In 1966, after Fort Randall Dam had created Lake Francis Case, it was discovered that some of the burials at St. Phillips Cemetery had not been removed. A Corps memorandum, dated February 1, 1966, indicates that a deer hunter reported in December 1965 [4] that graves containing bones had been uncovered at the cemetery. According to the memorandum, the alternate flooding and drying of the cemetery site had made the outline of each grave easily discernable. Someone had dug into thirty-five to forty of the graves, and scattered bones on the ground around nine of them. Assuming that all known graves had been removed under the contract, the Corps concluded that the graves still containing bones were unmarked and unknown to authorities at the time of the move. In response to the discovery, the Corps contacted area residents and the Chairman of the Yankton Sioux Tribal Council. The Corps first planned to remove and re-bury the bones from the nine graves during low water in the fall of 1966,

3. One witness, a civil engineer who testified for the Tribe, stated that the Corps could meet these needs by "moderately adjusting its operations" at the other five reservoirs in the Main Stem System. The dams in the system, listed going downstream, are: Fort Peck, Garrison, Oahe, Big Bend, Fort Randall, and Gavins Point.

4. The memorandum actually states that the deer hunter's report was in "mid–December 1966," but since the memorandum was apparently written in February 1966, several months before that date, the Court infers that the author of the memorandum meant to write "mid–December 1965."

but then decided instead to disinter and reinter the bones immediately. According to the memorandum, the bones from the nine graves were removed and reburied at the new St. Phillip's Cemetery in Lake Andes before the end of January 1966.

On October 18, 1990, a Corps park ranger investigated the site of old St. Phillip's Cemetery following a report by two local fishermen that they had observed some bones and casket parts along the shoreline. His investigation confirmed their report. "Skeletal remains, exposed caskets, casket parts and other scattered fragments of miscellaneous material were evident at the site," most of them near the shoreline, which at that time was 1341 feet above sea level. (Ex. G at 10.) Although the Lake Manager's Office apparently made some attempts to have the remains removed and reburied, it eventually settled on covering the bones with a type of white fabric.[5] In December 1991, Corps personnel again visited the cemetery, where they counted six or more burials which had been missed by the contractor responsible for removal. (Ex. G. at 1.) Some new bones had been exposed since the investigation in 1990. In response, the Corps decided to leave the old covering in place, put additional fabric over the newly exposed bones, and notify the Tribe and the South Dakota State Archeologist.

While the Corps evidently contacted some members of the Tribe, it is not clear who the Corps contacted or what it told them. Lawrence Kiyukan, a Tribal member who is employed by the Bureau of Indian Affairs, testified that the Tribe contacted him in 1990 and asked him to check on the old cemetery. Kiyukan observed human remains there in 1990, 1991 and sometime between 1994 and 1996. On September 3, 1992, the Vice–Chairman of the Tribe wrote to the Corps, explaining that the "Tribe's position in this matter is to remove and rebury the remains at the St.

Phillips Cemetery in Lake Andes." (Ex. 25 at 4.) His letter further stated that "[w]e are giving you official notice in this matter and will proceed in reburial as soon as the low water interval has commenced." (Id.) The Tribe, however, did not proceed with reburial. On February 28, 1995, Sandra Barnum, the Corps' Cultural Resources Specialist for the Omaha District, sent a handwritten note to Maria Pearson, whom the Tribe had designated as its Repatriation Representative. In the note, Barnum stated that she visited the site on February 25, 1995. She promised Pearson that she would "keep an eye on the pool elevation and contact you when the level is down low enough to expose the site, and we can proceed from there." (Ex. 25 at 3.) Although Pearson remained the Tribe's Repatriation Representative, she was never again contacted by Barnum in connection with the remains at the cemetery.

On Friday, December 10, 1999, the remains were re-observed by Mike Hubert, a Corps park ranger. Hubert testified that he first learned of the remains, through another ranger, when he began working for the Corps in 1995. Although Hubert has visited the cemetery every year since, he did not actually observe any human remains until his visit in 1999. Upon viewing the remains, Hubert returned to his office and contacted Richard Harnois, the Corps' field archeologist for South Dakota. On Monday, December 13, Hubert and Harnois visited the site, along with defendant Thomas Curran, the Operations Manager at Fort Randall, and Todd Christopherson, a general contractor who came at the invitation of Harnois. The men observed seven skulls and other human bones scattered at the site, including femurs, hipbones, and ribs, and counted twenty-five to thirty exposed graves, including several exposed caskets, some of which also contained bones. (Tr. at 48.) After conducting a survey of the site, Cur-

---

5. In contrast to the officials at the Lake in 1966, the Lake Manager in 1990 concluded that the funeral home which had contracted to complete the disinterment and reinterment had failed to comply with its contractual obligations as set forth in the original Cemetery Relocation Plan. (Ex. G at 7.) The Corps' Pierre Real Estate Office apparently ruled out re-opening the contract or filing suit against the funeral home. (Ex. G at 5–6.)

ran superimposed the locations of thirty exposed caskets on a map of the cemetery which had been filed with the original relocation plan. (Ex. H at 6.) Curran's map thus shows the location of the exposed caskets in relation to where graves in the cemetery were thought to be located prior to disinterment in the 1950's.

The Corps contacted the Tribe the day after this visit to the site. On December 14, Hubert telephoned Barnum, who told him that Ben Gonzalez was the Tribe's Cultural Representative. Hubert then called Gonzalez, and said that he was calling as a courtesy to inform Gonzalez that the remains were visible again. Faith Spotted Eagle, another member of the Tribe, called Hubert back at the direction of Gonzalez and asked to meet about the situation. That afternoon, Hubert and Spotted Eagle arranged for other members of the Tribe to accompany Hubert to the site the next day. On December 15, Hubert took Elsworth Chytka, Lindsay Chytka, and Roxanne Spotted Eagle to observe the site.

Although Curran discussed with Tribal members the possibility of removing the remains, the remains were left at the cemetery. According to Faith Spotted Eagle, Curran told her on December 14 that the Lake's water level would rise high enough to cover the remains within one to two weeks. Spotted Eagle testified that she made no promises that the Tribe would remove the remains by then. Curran testified that Kiyukan called him on December 17 to say that a group of Tribal men would be collecting the remains on December 18, but that he called back later the same day and said that the remains would not be collected until after a meeting of the Tribal Council on December 22.[6] Prior to the meeting, Curran told some members of the Tribe that his office would provide the Tribe with financial resources and manpower to remove the remains from the site. Curran also attended the Tribal Council meeting, where he told the Tribe that the water would rise under normal operations and that he wanted to know what the Tribe wanted to be done with the remains by December 24. The Tribal members present at the meeting, which lasted at least two hours, numbered approximately between 25–40, and came in and out as the meeting progressed. At some point, the Tribal Council asked Curran to leave the meeting. Before the meeting was over, the Tribal Council had recessed the meeting until January 5, chosen a committee to study and make recommendations on the retrieval and reburial of the remains, and voted 39–0 to file this lawsuit.

The witnesses offered by the Tribe and the Corps gave different opinions about how the exposed bones at the cemetery can best be protected. Larry Zimmerman, a professor of anthropology at the University of Iowa who testified for the Tribe, rejected the Corps' idea for covering the remains with lake water (see below). Zimmerman testified that while one study indicates that covering remains with water is an acceptable second alternative to removing them from an exposed site, that study does not adequately take into account the erosive effects of raising and lowering the water level. Zimmerman offered three options for removing the bones. The first option, and the archeologically preferable one, is to map and remove all visible bones, field catalog all remains, remove all visible coffins, locate invisible remains below ground, and do forensic work on the bones to determine their identities. Zimmerman's second option, which involves picking up only exposed skeletal remains on the surface and conducting simple mapping and forensic work, admittedly leaves some remains vulnerable to erosion, whether or not they are later covered with water. The third option, which involves picking up only the remains in immediate jeopardy, simple mapping, and no forensic testing,

6. The Yankton Sioux Tribal Council is comprised of all members of the Yankton Sioux Tribe who are eligible to vote in a general tribal election, that is, "all eligible members of the Yankton Sioux Tribe eighteen (18) years or older." (Ex. A, Amended By–Laws Article II, § 3.) Under the Constitution of the Yankton Sioux Tribe, "twenty members shall constitute a quorum at general meetings." (Id., Amended By–Laws, Article III, § 3.)

suffers from the same drawback. Under current weather conditions, Zimmerman's first option would necessarily entail thawing the ground around frozen caskets and remains with portable heaters and tents. It would require approximately two weeks to assemble a crew, take approximately one day per body recovered, and cost well in excess of $100,000. Zimmerman's other two options, neither of which requires thawing of the ground, would take significantly less time.

Harnois, testifying for the Corps, stated that the exposure to the weather, especially freezing and thawing, is the major threat to the remains and that flooding the site to a sufficient depth to prevent wave action (about ten feet) would be the best method of protecting them. He admitted, however, that some erosion is inevitable, even under water, and that exposed remains might be washed downstream while they are flooded. He rejected the idea of covering the remains with fabric before flooding them, because the heavy material which he envisioned would be necessary to weigh down the fabric might damage the remains. He testified that it would take no more than two days to pick up the remains which are already exposed and that, with proper planning, the Corps could use remote sensing equipment to locate undiscovered remains and remove them along with the approximately thirty grave sites now frozen in the ground. Harnois estimated that such a removal would require a week for the remote sensing and a month or more for removing the contents of the graves. Any such effort, he said, would be carried out in accordance with the wishes of the Tribe.

The Tribe's tradition requires that certain ceremonies be performed prior to disturbing the remains. One set of ceremonies must be performed by the Braveheart Society, a traditional society of women which was revived by Tribe members in 1994. After the Braveheart Society has completed its ceremonies, the Tribal medicine men must perform another set of ceremonies. According to the affidavits, these ceremonies take approximately four days each, for a total of eight days. At the hearing on the Tribe's motion for a temporary restraining order on December 23, the Tribe's attorney stated that "the [members of the Braveheart Society have started their prayer ceremonies as of today," and that "the men's society will be starting theirs shortly." (Tr. at 3–4.) The ceremonies of the Braveheart Society, however, did not begin until January 2, 2000, the day before the hearing on the Tribe's motion for a preliminary injunction. At the hearing, one of the affiants, Glenn Drapeau, testified that it would take over a month to perform the required traditional ceremonies.

The Tribe seeks time to remove the remains in accordance with its own traditions and wishes under the Native American Graves Protection and Repatriation Act (the "Act"). Although the Tribe did not amend its pleadings, it modified its request for relief orally in open court at the preliminary injunction hearing.[7] During the hearing, the Tribe asked for an injunction preventing the Corps from raising the water level until the Tribe has had enough time to complete unspecified religious ceremonies, consult with anthropologists, decide what to do with the human remains, and remove the human remains from the site. The Corps opposes all of the Tribe's requests for relief.

## DISCUSSION

■ The Court has jurisdiction under both 25 U.S.C. § 3013 (jurisdiction over actions alleging violations of the Act) and 28 U.S.C. § 1362 (jurisdiction over civil actions brought by Indian tribes which arise under the laws of the United States).[8]

---

7. Under the Federal Rules of Civil Procedure, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Fed.R.Civ.P. 15(b).

8. The government's sovereign immunity does not bar this lawsuit, because the United States has expressly waived its sovereign immunity in suits which, like this one, seek non-monetary relief. 5 U.S.C. § 702; *Black Hills Institute of Geological Research v. South Dakota*

The Court is not deprived of its jurisdiction simply because the requested relief, if granted, would affect the Corps' management of the Lake. Citing *Story v. Marsh,* 732 F.2d 1375 (8th Cir.1984), defendants argue that the Court does not have jurisdiction to interfere with the Corps' management of the water level in the Lake. In *Story,* the Eighth Circuit found that the Corps' decision to artificially crevasse portions of a levee on the New Madrid Floodway of the Mississippi River was an unreviewable action within the meaning of 5 U.S.C. § 701(a)(2), in light of Congress's "very broad" delegation of authority to the Corps to crevasse the levee and the Corps' considerable technical expertise in doing so. *Story,* 732 F.2d at 1379–81. In spite of its decision, however, the Court maintained that it had jurisdiction to determine whether the Corps' exercise of its discretion violated a "constitutional, statutory or regulatory command." *Id.* at 1381 (citation omitted). The Tribe does not assert that the Corps has made technical errors in managing the Lake; rather, it alleges that the Corps violated the Act's grave-protection provisions. The Court has jurisdiction to hear these claims.

The Act represents the culmination of "decades of struggle by Native American tribal governments and people to protect against grave desecration, to [effect the repatriation of] thousands of dead relatives or ancestors, and to retrieve stolen or improperly acquired cultural property." Jack F. Trope and Walter R. Echo–Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History,* 24 Ariz.L.J. 35, 36 (1992). The provisions of the Act are focused on the "cultural items" of Native American peoples,[9] which it defines as "human remains," "associated funerary objects," "unassociated funerary objects," "sacred objects" and "cultural patrimony." 25 U.S.C. § 3001(3).[10] In addition to its repatriation requirements, the Act makes several specific provisions for the protection of Native American cultural items, including human remains, which are excavated or discovered on federal or tribal lands after November 16, 1990.

First, the Act establishes detailed criteria and procedures for determining the "ownership and control" of such cultural items. Under the Act, the ownership or control of Native American human remains and associated funerary objects rests with the lineal descendants of the Native American who has left the remains or funerary objects. 25 U.S.C. § 3002(a)(1). In cases in which the lineal descendants cannot be ascertained, or which involve unassociated funerary objects, sacred objects, and objects of cultural patrimony, the Act develops a scheme for determining which tribe has the closest relationship, and hence the strongest entitlement, to the items, based on geographic and cultural factors. *See* 25 U.S.C. § 3002(a)(2). The regulations require federal agency officials to determine who is entitled to custody of the cultural items, and set forth procedures for the notification of potential lineal descendants and interested tribes. 43 C.F.R. § 10.6.

The Act also governs the intentional excavation or removal of Native American human remains and objects from federal or tribal lands. The Act does not permit such excavation or removal unless the items are removed or excavated pursuant to a permit issued under the Archeological Resources Protection Act, 16 U.S.C. §§ 470aa–470mm. 25 U.S.C. § 3002(c)(1). It also prohibits the intentional removal of

School of Mines and Technology, *12 F.3d 737, 740 (8th Cir.1993),* cert. denied, *513 U.S. 810, 115 S.Ct. 61, 130 L.Ed.2d 18 (1994) (subsequent history omitted).*

**9.** While the Act protects the cultural items of both Indian tribes and Native Hawaiian organizations under the rubric of "Native American" cultural items, this opinion deletes references to Native Hawaiian organizations because they are not relevant here.

**10.** Associated funerary objects, unassociated funerary objects, sacred objects, and cultural patrimony are all further defined by the Act itself, *see* 25 U.S.C. § 3001(3)(A)–(D), but their definitions are not relevant, and are thus not quoted, here.

Native American cultural items from such lands prior to consultation with or, in the case of tribal lands, without the consent of, the appropriate Indian tribe, and proof of such consultation or consent. 25 U.S.C. § 3002(c)(2), (4). The Act's implementing regulations set forth detailed procedures for consulting with Indian tribes in the event of such an intentional excavation. 43 C.F.R. §§ 10.3(b), 10.5. Section 3002(a), discussed above, governs the ownership and control of Native American cultural items which are intentionally excavated or removed.

Finally, the Act governs the inadvertent discovery of Native American cultural items on federal or tribal lands. In pertinent part, the Act provides:

> Any person who knows, or has reason to know, that such person has discovered Native American cultural items on Federal or tribal lands after November 16, 1990, shall notify, in writing, the Secretary of the [Interior], or head of any other agency or instrumentality of the United States, having primary management authority with respect to Federal lands and the appropriate Indian tribe . . . with respect to tribal lands, if known or readily ascertainable. . . . If the discovery occurred in connection with an activity, including (but not limited to) construction, mining, logging, and agriculture, the person shall cease the activity in the area of the discovery, make a reasonable effort to protect the items discovered before resuming this activity, and provide notice under this subsection. Following the notification under this subsection, and upon certification by the Secretary of the department or the head of any agency or instrumentality of the United States or the appropriate Indian tribe . . . that notification has been received, the activity may resume within 30 days of such certification.

25 U.S.C. § 3002(d)(1). As with Native American cultural items which are intentionally excavated or discovered, such items which are inadvertently discovered are subject to the "ownership and control" provisions of § 3002(a).

In addition to requiring federal agency officials to report the inadvertent discovery of Native American cultural items, the regulations implementing § 3002(d) impose six additional obligations on responsible federal agency officials who receive notification that Native American cultural remains have been inadvertently discovered on federal lands. Such officials must, within three working days from notification: (1) certify receipt of the notification; (2) take immediate steps, if necessary, to further protect the cultural items, including, as appropriate, stabilization or covering; (3) notify Indian tribes which might be entitled to ownership or control of the cultural items under the Act; (4) initiate consultation on the inadvertent discovery pursuant to 43 C.F.R. § 10.5 (governing consultation with Indian tribes); (5) follow the provisions of 43 C.F.R. § 10.3(b) (governing intentional excavation or removal) if the cultural items must be excavated or removed; and (6) ensure that the disposition of the cultural items is carried out following 43 C.F.R. § 10.6 (governing custody of Native American cultural items). 43 C.F.R. § 10.4(d)(1).

■ Assuming that the exposed bones at St. Phillip's cemetery are the remains of deceased Native Americans,[11] they are "human remains" within the meaning of the Act. Such bones clearly fall within the regulations' definition of human remains as "the physical remains of a person of Native American ancestry . . . [excluding] remains or portions of remains that may reasonably be determined to have been freely given or naturally shed by the indi-

11. This assumption, which is supported by the affidavits of Glenn Drapeau and Faith Spotted Eagle, was not contested by the Corps at either hearing. The contents of the Relocation Plan, which state that the Corps' investigation of St. Phillip's Cemetery was conducted by contacting members of the Tribe, further support the assumption. *See* Relocation Plan Ex. A, Pt. 1.

vidual from whose body they were obtained, such as hair made into rope or nets." 43 C.F.R. § 10.2(d)(1). Defendants' suggestion, in oral argument, that the Act applies only to prehistoric human remains, cannot be accepted. A statute must be interpreted "to give effect, if possible, to every clause and word" within it. *United States v. Menasche,* 348 U.S. 528, 538–39, 75 S.Ct. 513, 520, 99 L.Ed. 615 (1955). If the Act applied only to prehistoric human remains, its priority for lineal descendants in questions of ownership and control of human remains and associated funerary objects would be meaningless, since it is nearly, if not completely, impossible to determine the lineal descendants of persons who died before recorded time. The Act must therefore be interpreted to apply to all human remains within the meaning of 43 C.F.R. § 10.2(d)(1), and not merely human remains of prehistoric origin.

■ The Corps' re-observation of the cemetery site in 1999 constitutes an inadvertent discovery of human remains. The regulations define an inadvertent discovery as "the unanticipated encounter or detection of human remains, funerary objects, sacred objects, or objects of cultural patrimony found under or on the surface of Federal or tribal lands." 43 C.F.R. § 10.2(g)(4). It was argued that the Corps' discovery in 1999 was not inadvertent, since it knew that remains were already present at the site, and either knew or should have known that the Lake's wave action was eroding the shoreline. However, it does not appear, from the Corps' 1991 memoranda, that it anticipated any additional remains to be uncovered at the site. Even if the Corps had anticipated some additional exposure of remains, its uncovering of the remains through regulating the Lake's water level clearly does not fit

the regulations' definition of intentional excavation as "the planned archeological removal of human remains, funerary objects, sacred objects or objects of cultural patrimony found under or on the surface of Federal or tribal lands." 43 C.F.R. § 10.2(g)(3). Defendants appear to argue that the Corps' uncovering of the remains is neither an inadvertent discovery nor an intentional excavation, and thus falls entirely outside the purview of §§ 3002(c) and (d). Such an interpretation, however, is inconsistent with the canon of construction that statutes "are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *County of Yakima v. Yakima Indian Nation,* 502 U.S. 251, 112 S.Ct. 683, 693, 116 L.Ed.2d 687 (1992) (citation omitted); *see also* F. Cohen, *Handbook of Federal Indian Law* 224 (1982). In accordance with this canon of construction, the Corps' uncovering of remains at St. Phillip's Cemetery qualifies as an inadvertent discovery within the meaning of § 3002(d).

■ Section 3002(d) and its regulations apply to the Corps' discovery.[12] The Corps discovered at least some of the remains at the site after November 16, 1990, the effective date of § 3002(d). While defendants point out that some remains were discovered at the site prior to that date, first in 1965 and again in October 1990, it is clear that additional human remains have been exposed since then. Section 3002(d) refers to the discovery of Native American cultural items, not the site that contains them, and makes the Corps responsible for the discovery of these newly discovered remains.[13] In addition, the Corps' regulation of the Lake's water level, and its consequent effect upon the lakeshore, is an "activity" under § 3002(d). Defendants ar-

---

12. The Corps concedes that it and its employees are "persons" within the meaning of § 3002(d), *see* 43 C.F.R. § 10.2(a)(5) (defining "person"), and that the cemetery is located on federal land, *see* 25 U.S.C. § 3001(5) (defining "federal lands").

13. It is likely that some of the remains currently at the site are those that were discover-

ed by the park ranger in 1990. However, because the Corps has made no attempt to distinguish remains discovered before the effective date of § 3002(d) from remains that were discovered after the effective date, the Court will treat all of the remains at the site as covered by the statutory and regulatory requirements for inadvertent discoveries.

gue that "activity," in the context of this subsection, refers strictly to development activity such as mining, construction, logging or agriculture. However, the text of § 3002(d), according to its plain meaning, does not restrict "activity" to "development," stating that the term includes, but is not limited to construction, mining, logging, and agriculture. These examples merely illustrate activities which are likely to result in the unearthing or other discovery of Native American cultural items. As this case demonstrates, the Corps' regulation of the water level at the Lake, through the erosion it produces, has this very effect.

As the inadvertent discoverer of remains protected by § 3002(d) and the federal agency with primary management authority over the land on which they were discovered, the Corps has three duties. First, the Corps must meet certain notification and certification requirements which are discussed below. Second, the Corps must refrain from raising and lowering the water levels of the Lake over the cemetery for at least thirty days from the date of certification. The Corps is currently complying with this requirement under the terms of the Court's Temporary Restraining Order, and must continue to do so as provided in this Opinion. Finally, the Corps must take steps to protect the remains. As the discoverer of the remains, the Corps has a statutory duty to make "a reasonable effort to protect them"; as the federal agency responsible for managing the site, it must "further secure and protect inadvertently discovered human remains ... including, where necessary, stabilization and covering." 43 C.F.R. § 10.4(d)(ii). Because the Corps has ceased raising the water level in the Lake, the principal issues now before the Court are whether the Corps must comply with the Act's notification requirement and what actions the Corps must take to comply with its duty to protect the remains.

In its separate roles as the discoverer of the remains and as the federal agency with primary management authority over the site, the Corps had several duties of notification and certification. Because the remains were discovered on federal land, the Corps members who discovered them were required to "provide immediate telephonic notification of the inadvertent discovery, with written confirmation, to the responsible Federal agency official." 43 C.F.R. § 10.4(b). The purpose of this requirement is to ensure that the government receives timely, reliable notice from persons who have discovered Native American cultural items. Because the Corps received such notice on December 13, when Mike Hubert reported his observations at the cemetery to Tom Curran,[14] there is no reason to go through the formality of requiring Hubert to write down what he saw. The Corps was also required to "certify" its receipt of notification. 43 C.F.R. § 10.4(d)(i). This certification, which is not required to be written, simply acknowledges receipt of the discoverer's notification. Curran clearly did so in his oral communications with Hubert and their subsequent visit to the site on December 13. Finally, as the governmental recipient of Hubert's notice, the Corps was required to "notify by telephone, with written confirmation," the Indian tribes likely to be culturally affiliated with the inadvertently discovered human remains, the Indian tribe which aboriginally occupied the area, and any other Indian tribe that is reasonably known to have a cultural relationship to the human remains." 43 C.F.R. § 10.4(d)(1)(iii). While the Corps did not supply the Tribe with written notice, the Tribe cannot now contend that it was prejudiced in any way by the manner in which it received notification from the Corps. The Corps' failure to provide such notice to the Tribe does not give the Tribe additional time to collect

14. The Corps may have received additional notification when Hubert contacted Sandra Barnum, the Corps' Cultural Resources Specialist for the Omaha District. However, it is unclear from the record whether Hubert informed Barnum of what he had discovered, or simply asked her for the name of the Tribe's cultural representative.

the remains. The statutory thirty-day cessation of activity dates from the time of certification to the person who discovered the remains, not from the time the Tribe received notice. *See* 25 U.S.C. § 3002(d)(1) ("the activity may resume after 30 days of such certification"); 43 C.F.R. §§ 10.4(c), (d)(2).

The appropriate method for protecting the remains is confined, to some extent, by the Act and its regulations. Allowing the Tribe an indefinite amount of time to perform its traditional ceremonies and gather its dead seems to be the best way to respect the Tribe's members, who have already been forced to endure the sight of their ancestors exposed on the lakeshore. However, the Act and regulations require that other interests be considered as well. Under the regulations, no one is allowed to conduct an intentional excavation of human remains until the Corps has consulted with possible lineal descendants and other tribes whose members might be buried at the site, and used that consultation to develop a written plan of action. *See* 43 C.F.R. §§ 10.3(b); 10.4(d)(1)(v). While it seems impossible that the Corps might locate the lineal descendants of any of the loose remains, it is possible that some of the Native Americans whose remains have been scattered were not members of the Yankton Sioux.[15] While it would be preferable to require the Corps to maintain the Lake's water level until it accomplishes these duties, the Act allows the Corps to resume the activity which caused the discovery within thirty days after certification. 25 U.S.C. § 3002(d). This statutory provision, on the basis of the record as it now exists in this case, allows the Corps to resume its raising and lowering of the water level in the Lake on January 13, 2000.

 Before that date, the Corps' statutory duty of protection requires it to at least gather the remains and any other cultural items which are scattered loose upon the ground. After an inadvertent discovery, the Corps must "cease the activity in the area of the discovery, [and] make a reasonable effort to protect the items discovered before resuming such activity. . . ." 25 U.S.C. § 3002(d); *see also* 43 C.F.R. § 10.4(d)(1)(ii). Although the regulations generally require that the Corps obtain a permit, consult with various Indian tribes and develop a written plan of action before excavating or removing cultural items, *see* 43 C.F.R. § 10.4(d)(1)(v) (referencing § 10.3(b), which in turn references §§ 10.5 and 10.6), that requirement conflicts with the Corps' duty to protect these particular remains. In this case, an immediate removal is necessary to protect the loose remains, since the statute allows the Corps to resume its activity, and the flooding which will result from the Corps' raising of the water level would probably wash at least some of the remains away. The Act's provisions protecting Native American cultural items take precedence over its provisions requiring consultation with Indian tribes. Thus, while the Corps is not otherwise exempt from the requirements of § 10.4(d)(v), it must remove these re-

---

**15.** The affidavits of both Glenn Drapeau and Faith Spotted Eagle stated that the persons buried at the cemetery were "almost exclusively Sioux Tribal" members, not specifically members of the Yankton Sioux Tribe. The Affidavit of Glenn Drapeau suggests that the site has been used since pre-historic times. The Court cannot presume, without notice to other Indian tribes as required under the Act and the regulations, that other tribes do not also have potential claims as to some of the cultural items at the site. There is no evidence in the record to show whether the loose remains could be identified as Yankton Sioux as opposed to other Sioux Tribal members. In addition, the record does not yet contain information on whether or not any of these remains are from pre-reservation times and whether anyone else occupied these lands at any earlier times, questions which may subsequently be determined.

To illustrate one aspect of the need for continuing jurisdiction before final resolution, plaintiffs do not want the remains to be subjected to any scientific study, while it appears that the Corps may wish to conduct such a study as necessary, in its view, to discharge its duties under the Act.

mains before it initiates consultation under that section.

The Corps must also remove the remains before it allows the Lake's water to flood the site. The Corps' obligation to protect the loose remains presents a potential conflict with the Act's thirty-day period, because it is not clear whether the Corps will have enough time to remove all of the loose remains before January 13. The Corps' own archeologist testified that it would take "no more than two days" to collect the loose remains. When the Act is viewed as a whole, the duty it imposes on the Corps to protect the human remains that are lying loose on the shore of the Lake takes precedence over its provision for a limited thirty-day cessation in activity. Thus, the Corps may not raise the water level above 1340.3 until the last of the following times: the expiration of the thirty-day period on January 13, 2000 or the removal, for protective purposes, of the loose remains and other cultural items at the site.

Plaintiffs shall not interfere with defendants' discharge of this duty. It is hoped that the parties can agree on a culturally sensitive way in which to accomplish this solemn responsibility. The fact that the Corps is required to protect the remains does not prevent it from reaching such an agreement with the Tribe.[16] The Act does not require that the Tribe be allowed to collect the remains itself or that the Corps store the remains in any particular way. However, the regulations' concern for the traditional treatment of Native American human remains and funerary objects, *see* 43 C.F.R. § 10.5(e)(7), (g), suggests that the Corps should be sensitive to any desire of the Tribe or its members to perform the actual recovery of the remains and the Tribe's requests for treating the remains with dignity until final custody of the remains can be determined. The Corps could, for example, have Tribal members designated by the Yankton Sioux gather remains with the Corps as observers. The remains could then be held by the Corps or its designee pending final custody determinations.

An equally sensitive issue is how to protect the scattered remains and cultural items which cannot be safely removed from the frozen ground, remains or cultural items within caskets, and the caskets themselves. The Tribe asserts that these items should be protected by an indefinite injunction against any increase in the Lake's water level. However, such an injunction would contradict the Act's limited thirty-day period of cessation of activity, and is not necessary to satisfy the Act's protection provisions. The Corps asserts that the best method of protecting the remains is to cover them with at least ten feet of lake water-an approach which would protect the remains from the weather. While the Tribe objects that the Corps' solution would leave remains vulnerable to being washed downstream, neither the Tribe nor the Corps supports the idea of covering the individual grave sites and other exposed cultural items with fabric until the water level drops again next fall. The Corps' Annual Operating Plan projects that the water level in the Lake will exceed 1351 feet for most of the period of time between February 29, 2000 and September 30, 2000.[17] The Corps may there-

**16.** Until the Corps determines final custody of the remains pursuant to 25 U.S.C. § 3002(a) and 43 C.F.R. § 10.6, the Corps must also safeguard the loose remains after they have been recovered. However, 25 U.S.C. § 3009(1) and its legislative history establish that the Act is not to limit the authority of any federal agency to enter into any other agreement with the consent of the culturally affiliated tribe as to the disposition or control over items covered by the Act. The Corps could reach an agreement with the Tribe for the Tribe or some other designee to safeguard these remains until final custody is determined.

**17.** The 1999–2000 Annual Operating Plan predicts the following water levels, given median runoff, during this period of time: February 29–1350.0, March 15–1353.6, March 22–1355.2, March 31–1355.2, April 30–1355.2, May 31–1355.2, June 30–1355.2, July 31–1355.2, August 31–1355.2, September 30, 1353.5. (Ex. F.)

fore protect the remains by allowing the waters of the Lake to cover them in accordance with the Annual Operating Plan, and will be required to notify both the Tribe and the Court if the water level in the Lake drops below the levels projected in the Plan for the period of time between February 29 and September 30, 2000.

While these protective measures are reasonable under the circumstances this winter, they may well not be reasonable next fall, because the Corps and the Tribe will by then have had time to prepare for the difficulties involved in recovering remains which are embedded in the ground and to coordinate a recovery effort. The Court is therefore granting a preliminary injunction at this time, and reserving final judgment on the Tribe's request for a permanent injunction until a subsequent trial on these issues. The parties may of course spend the intervening months reaching a decision on how to protect or excavate the remains at the cemetery, within the requirements of the Act and its regulations. *Cf. Environmental Defense Fund, Inc. v. Froehlke,* 477 F.2d 1033 (8th Cir.1973) (upholding the district court's decision to enjoin certain activities relating to the Corps' construction of a dam before the preparation of an Environmental Impact Statement, but to retain jurisdiction of the action pending the filing of the final E.I.S.).

In the meantime, the named defendants who are officers of the Corps shall be required, under a writ of mandamus, to protect the remains in accordance with this Opinion. "Under 28 U.S.C. § 1361, mandamus may issue against an officer of the United States only when the plaintiff has a clear right to relief, the defendant has a clear duty to perform the act in question, and the plaintiff has no adequate alternative remedy." *Borntrager v. Stevas,* 772 F.2d 419, 420 (8th Cir.1985), *cert. denied,* 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985). Under the Act and the regulations, the Tribe has a clear right to the protection of human remains of which its members are the likely descendants and defendants have a clear duty to protect those remains. There is no alternative remedy which could adequately compensate the Tribe for the loss or destruction of those remains.

The Tribe is also entitled to a preliminary injunction preventing the Corps from raising the Lake's water level until January 13, 2000. In deciding whether to issue a preliminary injunction, the Court considers: (1) the threat of irreparable harm to plaintiffs; (2) the state of the balance between this harm and the injury that granting the temporary restraining order will inflict on defendants; (3) the probability of plaintiffs' success on the merits; and (4) the public interest. *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981). Allowing the Lake's waters to rise before the expiration of the Act's thirty-day cessation of activity will irreparably harm the Tribe, by allowing the water to damage and possibly wash away human remains which are sacred and dear to the Tribe. A cessation of activity until January 13 or the until the protection of the loose remains is accomplished will not cause much, if any, harm to the Corps. The Tribe has already established that the Corps is required to cease the activity which caused the discovery until January 13, and under the testimony presented by the Corps, it should not take more than two days to gather the remains. Finally, the public interest, as expressed by Congress in passing the Act, supports issuing a preliminary injunction to give the Corps time to protect the remains. The Act does not prevent the Corps from operating the Lake at a lower than ·anticipated water level, in order to facilitate the recovery of the human remains which were unanticipatedly discovered at the site. Accordingly,

IT IS ORDERED:

(1) that defendants United States Army Corps of Engineers and its officers, agents, servants, employees, attorneys and all other persons in active concert or participation with them, including named defendants Joe N. Ballard, Chief Engineer, Army Corps of Engineers, and Tom Curran, Operations Manager, Army

Corps of Engineers Fort Randall Project, shall not raise the water level of Lake Francis Case higher than 1340.3 feet above sea level until the last of two dates: January 13, 2000 or when all of the loose human remains and any other loose cultural items have been removed from the lakeshore;

(2) that if defendants and plaintiffs cannot agree to a resolution which permits Tribal members to gather the human remains and other cultural items which are loose upon the ground at the site, defendants shall protect the loose remains by gathering them before the Corps raises the water level at Lake Francis Case above 1340.3 feet;

(3) that defendants shall promptly inform the Court and plaintiffs if the water level at Lake Francis Case drops below the levels predicted for median runoff in the 1999–2000 Annual Operating Plan at any time between February 29, 2000 and September 30, 2000.

(4) that the date for a trial on the requested permanent injunction will be subsequently set.