YANKTON SIOUX TRIBE, and its individual members, Plaintiffs,

v.

UNITED STATES ARMY CORPS OF ENGINEERS; Thomas E. White, Secretary of the Army; Dominic Izzo, Principal Deputy Assistant Secretary of the Army for Civil Works; Robert E. Flowers, Chief of Engineers; Curt F. Ubbelohde, Omaha District Commander and District Engineer; The United States of America; The State of South Dakota; John Cooper, Secretary of the Department of Game, Fish and Parks for the State of South Dakota; and John Does, Contractors, Defendants.

No. CIV. 02–4126.

United States District Court,
D. South Dakota,
Southern Division.

June 28, 2002.

Mary Turgeon Wynne, Okanogan, WA, for plaintiffs.

Bonnie P. Ulrich, U.S. Attorney's Office, Sioux Falls, SD, John P. Guhin, Attorney General's Office, Pierre, SD, for defendants.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

The Court orally granted, in part, plaintiffs Yankton Sioux Tribe, a federally recognized Indian Tribe, and its individual members' motion for a temporary restraining order pursuant to Federal Rule of Civil Procedure 65 on June 11, 2002, followed by a written Order issued on June 14, 2002. Pursuant to the parties' stipulation, the temporary restraining order is in effect until June 28, 2002. Pending before the Court are plaintiffs' motions for preliminary injunction, Docs. 8 and 22. The parties submitted simultaneous briefs addressing the request for preliminary injunction as stated in plaintiffs' first motion, Doc. 8. A second motion, Doc. 22, was filed at the same time as the briefs. Thus, the defendants have not had an opportunity to specifically respond to the second motion.

Generally, plaintiffs seek a preliminary injunction ordering the defendants to restrain immediately and pending final hearing and determination of this action from taking any action to further destroy a burial site located at an area known as the North Point Public Recreation Area ("North Point") near Pickstown, South Dakota, which was discovered on May 14, 2002. Among other claims, plaintiffs allege in their Amended Complaint that defendants have violated the Native American Grave Protection and Repatriation Act, 25 U.S.C. § 3001 *et seq.* ("NAGPRA")[1], by: (1) removing Native Ameri-

---

1. Plaintiffs' original Complaint filed on June 5, 2002, cited to NAGPRA in the "Preliminary Statement" portion of the Complaint, but did not specifically allege a violation of NAGPRA.

The Court granted plaintiffs' oral motion to amend the complaint on June 10, 2002 and plaintiffs submitted an Amended Complaint

can human remains from the burial ground without notice, consultation or consent by plaintiffs or obtaining a permit under the Archeological Resources Protection Act of 1979 ("ARPA"), 16 U.S.C. § 470aa *et seq.*, in violation of 25 U.S.C. § 3002(c); (2) the continued operation of heavy equipment and other activities at location A after the inadvertent discovery of human remains, funerary objects, and sacred objects, thereby violating the 30–day cessation-of-activity requirement imposed by 25 U.S.C. § 3002(d)(1); (3) failure to secure the burial ground and protect human remains and funerary objects after discovery in violation of 25 U.S.C. § 3002(d); and (4) failure to give the required notice of subsequent discoveries of human remains and funerary objects after a May 24, 2002 letter authored by an official of the State of South Dakota. (Amended Complaint, Doc. 9, ¶¶ 110–124.)

The Court held a hearing on the motion for temporary restraining order on June 7, 10 and 11, 2002. Several witnesses testified during the hearing and their testimony has been considered in deciding whether to impose a preliminary injunction. *See* Fed.R.Civ.P. 65(a)(2).

On June 11, 2002 an oral order was issued and on June 14, 2002 a written temporary restraining order was issued directing that John Cooper, in his official capacity as the Secretary of the Department of Game, Fish and Parks for the State of South Dakota, and his officers, agents, servants, employees, attorneys, and persons in active concert or participation with him who received actual notice of the temporary restraining order by personal service or otherwise, temporarily restrain from: (a) conducting any excavation, building or other construction activities at the North Point Recreation Area locations marked as "A," "B," and "C" on the map attached to the Order; and (b) excluding

any member of the Tribe who, for religious purposes, requests access to the North Point Recreation Area locations marked as "A," "B," and "C" on the map attached to the Order.

In the first motion for preliminary injunction, Doc. 8, plaintiffs seek an order requiring defendants to: (1) take reasonable actions to protect said burial site and all sites where dirt was removed from the North Point burial site and transferred to another site; (2) order the defendant to allow plaintiffs' unimpeded access to the sites for completion of customary and traditional rituals and burial rites; and (3) order the immediate return and repatriate of any remains, funerary objects, human remains and all other objects removed from the North Point burial site in cooperation with the plaintiffs.

In the second motion for preliminary injunction, Doc. 22, plaintiffs seek an order requiring defendants to: (1) restrain from excavation, operation of heavy equipment, movement of dirt and gravel, or any other construction activities within 500 feet of and at locations A, B and C and any other North Point area where dirt from location A was deposited; (2) protect on site all burial grounds, human remains, funerary objects, archeological objects and culturally significant objects at locations A, B and C, to include fencing and guarding, but excluding removal of any remains or objects without completing the requirements of 25 U.S.C. § 3002(d) and 43 C.F.R. §§ 10.4(d)(1), 10.3(b), 10.5 and 10.6; (3) restrain from impeding or limiting plaintiffs' access to the North Point area for the purpose of traditional religious or ceremonial activities; (4) examine all dirt removed from location A for the presence of human remains, funerary objects and items of cultural patrimony in a method respectful of the traditions and customs of the Yankton Sioux Tribe (hereinafter "the Tribe"); (5)

on June 11, 2002, specifically alleging violations of NAGPRA in Count IX.

return to location A all human remains removed from that location on May 20 and 23, 2002, in cooperation with the Tribe and protect the remains on site while completing any further repatriation, consultation, notification and certification processes pursuant to NAGPRA; (6) require defendants to complete the consultation, notification and certification processes required by NAGPRA and the statutes incorporated into NAGPRA, specifically 25 U.S.C. § 3002(d) and 43 C.F.R. 10.4(d)(1), 10.3(b), 10.5 and 10.6; and (7) protect on site any remains located at North Point until compliance with NAGPRA has been demonstrated by defendants.

Although the Amended Complaint is not verified, it is supported by the affidavits attached to the original complaint, as required by Rule 65(b). The Court has considered the allegations of the Amended Complaint and the affidavits and exhibits attached to the original complaint. During the hearing on the motion for temporary restraining order the following witnesses testified: Faith Spotted Eagle, Ellsworth Chytka, Robert Cournoyer, Sr., Glenn Drapeau, Sandra Barnum, Richard Adamson, Larry Janis, Jon Corey, Michael Fosha, and Eric Adamson. The Court received plaintiffs' Exhibits 1–6 and defendants' Exhibits A–N [2]. All parties filed additional documentation in support of their briefs on the preliminary injunction, which has been considered by the Court. Having carefully considered the issues and evidence presented and having considered the briefs of all parties, the Court will impose a preliminary injunction pursuant to Fed.R.Civ.P. 65(d).

### FACTUAL BACKGROUND

The record reflects that the State of South Dakota is further developing North Point to add approximately 100 more camping spots, as well as new roads, comfort stations, parking lots, and dumping stations. This is a major construction project and the State has hired several contractors to perform various tasks. One of the contractors performing dirt work at North Point is Adamson Construction, owned and operated by Richard Adamson. Adamson, along with four employees, has been working at North Point from late April 2002 to the present. There has been no showing, however, that Adamson has worked in any prohibited area at North Point after the Court entered its oral Order on June 11, 2002.

Eric Adamson, an employee of Adamson Construction and Adamson's son, was operating a front-end loader on May 14, 2002 when he observed some bones in the dirt he was removing. Eric stopped working and Adamson was called to the site. Upon seeing the bones and artifacts uncovered by Eric, Adamson directed Eric to stop digging and moving dirt. Adamson then immediately notified the Park Supervisor for North Point, Jon Corey. Corey directed Adamson and Eric to stop work for the day. Corey called Bob Schneider, an official of the South Dakota Department of Game, Fish and Parks ("GFP"), and Schneider visited the site. Schneider called the United States Army Corps of Engineer's ("the Corps") archeologist, Sandra Barnum, on the morning of May 15, 2002 and informed her that bones were uncovered at North Point. On May 15, 2002, it was unknown whether the bones were animal or human remains. Barnum called Corey and directed him to not allow any excavation within 100 yards of the uncovered bones, to collect the artifacts and to cover the bones with loose dirt.

2. The exhibits received during the hearing will be identified in this Order as "Pl.Ex." and "Df.Ex." and the exhibits attached to the Amended Complaint will be referred to as "Am.Comp.Ex."

Corey collected two tin bowls and a leather strap and placed these artifacts in his office and covered the bones as directed by Barnum. Adamson, as well as his employees, complied with Barnum's directions to not excavate within 100 yards of the bones.

The site where the remains were inadvertently discovered is identified on a map attached to an Affidavit of Doug Hofer, Doc. 7. The map also identifies two locations where dirt from the burial site and surrounding areas was placed before and after the discovery. For ease of reference in this opinion, the Court will attach and incorporate a copy of the map attached to Doug Hofer's Affidavit, which was also received as defendants' Exhibit L during the hearing on the motion for temporary restraining order. The location where the remains were found is marked as "A" and the two locations where the borrow material, i.e. the fill dirt, was placed are marked as "B" and "C" on the map attached to this opinion. These locations will be identified as "location A" and "locations B and C" in this opinion. There have been approximately 6,000 cubic yards of dirt removed from location A and placed at locations B and C, but the topsoil from location A was not removed to locations B or C. Rather, the topsoil was scrapped off the surface and placed into piles at location A and will later be spread back over the areas where dirt was removed to allow grass to be replanted.

Barnum visited location A on May 20, 2002 and brushed away the dirt that Corey had placed on top of the loose bones. She determined that the bones were human remains of at least three individuals. She collected the loose and scattered human remains, placed them in a box, and directed Corey to secure the remains and artifacts in his office. Barnum collected the remains because she believed there was a risk that the remains would be stolen or disturbed by others. Location A was easily accessible by the public. On May 20, 2002, Barnum could not determine whether the remains were Native American or Euro–American. She knew that the Tribe had asserted in the past that there were burial sites of their ancestors in the North Point area and that there was a high probability of such burial sites up and down the Missouri River. Two other bands of Native Americans, the Omaha and Ponca, also lived in this area and burial sites of Ponca ancestors have been located in the North Point area. The Tribe's headquarters are located approximately 10 miles from North Point. Location A, however, was also approximately 2 miles from the historic United States Army Fort Randall site where non-Indian as well as Indian people resided in the late 1800's.

Before Barnum left the site on May 20, 2002, she spoke with both Corey and Adamson and instructed them that dirt removal could continue in areas 100 feet away from the original point of discovery of the bones. When she left the site on May 20, 2002, no additional remains or artifacts were exposed. Possibly through miscommunication, further excavation took place within less than 100 feet from where the remains were found at location A when the topsoil was pushed into piles to the East of that location after May 20th.

Barnum and Michael Fosha, an archeologist employed by the State, visited location A on May 23, 2002. They decided to examine the slump area, which is the loose soil that slopes down from the top of the cut as dirt is removed. Using a whisk broom, they brushed away dirt in the slump area and discovered more loose and scattered human remains and artifacts, including seed beads, pipestone, a brass ring, brass tinckler (an item that is sewed on Native American women's dance dresses), and three or four dentalium shells. The portion of location A where the re-

mains and artifacts were collected from is indicated by the purple circle on defendants' Exhibit H. Corey brought the box with remains and artifacts gathered on May 20, 2002 back to the site and the newly discovered remains and artifacts were placed in the same box. Fosha transported all of these human remains and artifacts to the State Archeological Resources Center ("SARC") in Rapid City, South Dakota, for storage in a climate-controlled room. The room at the SARC for storing human remains was designed and built by the State in consultation with South Dakota tribes. As requested by the tribes, sage is present in the room to comply with Native American culture. Only one person is allowed to enter the room and she performs appropriate rituals before entering and leaving the room.

In addition to the loose remains found in the slump area, Fosha and Barnum observed human remains embedded in the soil. They were concerned about the safety of the embedded remains, but they did not want to excavate them at that time. Before Fosha and Barnum left the site on May 23, 2002, they directed Eric Adamson to place two loads of dirt (totaling 8 cubic yards) on top of the burial site depicted in defendants' Exhibit J to cover the remains still embedded in the soil.

Upon returning to his office on May 24, 2002, Fosha notified his supervisor of the inadvertent discovery of human remains and the NAGPRA process was then initiated to notify several Indian tribes in the event the remains were Native American. Neither Barnum nor any other Corps official participated in the drafting or mailing of the letter to notify the tribes. On May 24, 2002, James K. Haug, a South Dakota state archaeologist, mailed a letter to Jolene Arrow to inform the Tribe "of the inadvertent discovery of human remains in the Pickstown, S.D. area on Monday, May 20." (Pl.Ex.4.) The letter was addressed to Arrow because the State believed she was the "NAGPRA Coordinator" for the Tribe. Renae Boen, the Repository Manager for the South Dakota State Historical Society employed in Rapid City, faxed this letter to the Tribe's headquarters in Marty, South Dakota on May 24, 2002 and also called the headquarters. (Pl.Ex.2.) There were no employees working at Tribal headquarters on May 24, 2002, however, so none of the tribal officers learned of the May 24 letter until May 28, 2002. The tribal members that testified identified Maria Pearson as the Tribe's NAGPRA Coordinator, but none of the tribal members knew whether the State of South Dakota was so notified.

The letter sent by Haug informed Arrow that a construction crew excavating fill dirt from the North Point State Recreation Area uncovered human remains, leather, iron nails, tin cups or bowls and wood. (Pl.Ex.4.) Haug stated that "[w]ork at the area was halted as soon as the bones were discovered and the location secured." (Id.) An archaeologist employed by the Corps and an archaeologist employed by State of South Dakota, examined the site on May 23, 2002, and confirmed the presence of the partial remains of three humans in a shallow grave. (Id.) The letter implies that the discovered remains were removed from the site, but there is no mention of who removed the remains or where they were moved to. (Id.) Haug further stated that the rest of the remains should be exhumed on June 4, 2002 "as a protective measure." (Id.) Although Haug stated it was premature to identify the cultural affiliation of the remains, he disclosed that a preliminary examination suggested the remains are Native American. (Id.) If the remains are Native American, the Corps will initiate the NAGPRA process. (Id.)

Larry Janis is the Cultural Resources Manager for the Corps and is the Corps' contact person with regard to human re-

mains found at North Point. During the weeks of May 27, 2002 and June 3, 2002, Janis attempted to contact by telephone each of the tribes listed on Haug's May 24, 2002 letter. After speaking with several members of the Tribe, he was told that Ellsworth Chytka would be the designated representative for the Tribe. On June 8, 2002, Janis and Chytka had a conversation about beginning the consultation process under NAGPRA, even though it had not yet been formally determined whether the human remains found at location A were Native American.

As of the date of the hearing on the temporary restraining order, the possible cultural affiliation of the human remains had not been determined. Janis testified that public notification under NAGPRA will occur if it is determined that the remains are Native American. After public notification has been completed, the Corps will need to resolve any competing tribal claims for ownership of the remains and then enter into consultation with the affiliated tribe.

The issue of the remains at North Point was discussed during two meetings of the Tribe's governing body, the General Council. The first meeting was held on May 30, 2002. The meeting was continued over the weekend and reconvened on June 3, 2002. During the June 3, 2002 meeting the Tribe received a call from Boen, of the South Dakota State Historical Society. She informed the General Council that construction was ceased on May 20, 2002 in the area where the remains were found. The General Council authorized a delegation of tribal members to visit the site on June 3, 2002 to gather information and protect the remains. This lawsuit was authorized by the General Council during the June 3, 2002 meeting.

On June 3, 2002, at approximately 5:00 p.m., Glenn Drapeau, Faith Spotted Eagle and Ellsworth Chytka, along with several other tribal members (collectively the "tribal members"), visited location A and personally observed what appeared to be two human bones sticking out of a pile of dirt near the grave site identified by Haug in his May 24, 2002 letter. When the tribal members arrived, they saw a person operating a front end loader removing dirt from location A to be transported as fill material to locations B and C. Eric Adamson was operating the front end loader and he informed the tribal members that he was the person who discovered the human remains at location A. That initial discovery of human remains at location A was made on May 14, 2002.

Once tribal members discovered additional human remains, including what appeared to be a leg bone and a cervical vertebrae, in the dirt pile and informing the workers of the discovery, the workers agreed to stop their construction activities on June 3, 2002. None of the construction workers were present at location A when Spotted Eagle, Chytka, Drapeau and the other tribal members left at approximately 6:30 p.m. on June 3, 2002.

On June 4, 2002 at 7:30 a.m., Chytka returned to location A with his children, brother and his brother's children. Upon arriving at location A, Chytka and the individuals with him performed traditional cleansing and prayers and then walked to the site. They observed two human skulls, one more clearly visible than the other. Chytka had not seen either skull the evening before. Chytka believed additional dirt had been scraped from location A where the skulls were exposed between 6:30 p.m. on June 3, 2002 and 7:30 a.m. on June 4, 2002. Chytka brought stakes with him to location A on the morning of June 4, and he proceeded to place the stakes beside the remains he had found in the area.

John Corey, the Park Supervisor for the North Point Recreation Area, examined

most of location A at approximately 9:00 p.m. on June 3, 2002, and did not see any additional exposed remains. Specifically, Corey looked in the area where the skulls were found and did not see any skulls exposed at that time.

Spotted Eagle left·location A at approximately 6:30 p.m. on June 3, 2002 and returned at 8:30 a.m. on June 4, 2002. When she arrived, one of Chytka's children was crying and Spotted Eagle learned of the discovery of the two skulls. During the visit to location A on June 3, between 5:30 p.m. and 6:30 p.m., Spotted Eagle observed the area where the skulls were located on June 4, but she did not see the skulls on June 3.

Drapeau left location A at approximately 6:30 p.m. on June 3, 2002, and there were no construction workers at the site when he left. During his visit on June 3, 2002, Drapeau walked around the area near the original site of discovery, including behind the mound of dirt depicted in defendants' Exhibit H. On June 3, 2002, Drapeau did not see any skulls lying on the ground. Drapeau returned to location A at approximately 9:00 a.m. on June 4, 2002, and saw the two skulls identified by Spotted Eagle and Chytka. When Drapeau returned to location A on June 4, 2002, he observed that more dirt had been removed from the site after he left on June 3, 2002.

Fosha returned to location A at approximately 5:00 p.m. on June 4, 2002. He concluded that the burial site depicted in defendants' Exhibit J had been disturbed by humans walking and digging in the soil placed over the site on May 23, 2002. Barnum did not visit location A again, but having viewed the pictures taken by Fosha on June 4, 2002, she agrees that the soil was disturbed after the dirt was placed over the site on May 23, 2002. Fosha took the photographs marked as defendants' Exhibits H, I and M on June 4, 2002.

When he saw the skull depicted in defendants' Exhibit M by the stake marked "E16" he concluded that the soil around the skull had been removed by humans earlier that day. The soil around the skull was still a darker color indicating· that the moisture in the soil had not yet evaporated from exposure to the air.

The record does not indicate how the skulls and other remains seen at location A on June 4, 2002 were uncovered between the hours of 9:00 p.m. on June 3 and 7:30 a.m. on June 4, but the record does demonstrate that at least one skull was present at the burial site as of May 29, 2002. On May 29, 2002, Adamson observed a human skull near the area where remains were removed on May 23, 2002 by Fosha and Barnum. Adamson drew an orange circle on defendants' Exhibit H where ·he saw the skull. Adamson showed his son, Eric, the skull on May 29, 2002 and then Adamson used his hands to cover the skull with dirt.· Neither Adamson nor Eric told anyone ·about this discovery. The reason Adamson did not tell any State or Federal official about the skull was because he felt that he should not have been "poking around" there. Considering all of the testimony and exhibits presented at the hearing, the Court does not find that additional construction activities were conducted by Adamson or his employees at location A between the hours of 9:00 p.m. on June 3, 2002 and 7:30 a.m. on June 4, 2002. The question of how these remains were uncovered, while disturbing to the Court and the parties, does not need to be resolved for purposes of ruling on the motions for preliminary injunction.

At some point on or about June 4, 2002, Corey, with the assistance of Chytka, erected orange snow fences around location A and the State began providing 24–hour security by the Department of Game, Fish and Parks. The State represented at the hearing on the motion ·for temporary

restraining order that it would continue to provide such security for at least 30 days.

## DECISION

The Court has jurisdiction in this case pursuant to 25 U.S.C. § 3013 and 28 U.S.C. § 1362. Venue is proper under 28 U.S.C. § 1391(b). The United States has not attempted to invoke its sovereign immunity. The Administrative Procedures Act expressly waives the United States' sovereign immunity in suits seeking nonmonetary relief. *See* 5 U.S.C. § 702; *Black Hills Institute of Geological Research v. South Dakota School of Mines and Technology,* 12 F.3d 737, 740 (8th Cir.1993).

NAGPRA represents the culmination of "decades of struggle by Native American tribal governments and people to protect against grave desecration, to [effect the repatriation of] thousands of dead relatives or ancestors, and to retrieve stolen or improperly acquired cultural property." Jack F. Trope and Walter R. Echo–Hawk, *The Native American Graves Protection and Repatriation Act: Background and Legislative History,* 24 Ariz.St.L.J. 35, 36 (1992). NAGPRA protects "cultural items" of Native American peoples, which are defined as "human remains" and "associated funerary objects," "unassociated funerary objects," "sacred objects," and "cultural patrimony." 25 U.S.C. § 3001(3). In addition to its repatriation requirements, NAGPRA has several specific provisions for the protection of Native American cultural items, including human remains, which are excavated, removed or discovered on federal or tribal lands after November 16, 1990.

First, NAGPRA establishes detailed criteria and procedures for determining the "ownership and control" of such cultural items. Under NAGPRA, the ownership or control of Native American human remains and associated funerary objects rests with the lineal descendants of the Native American who has left the remains or funerary objects. *See* 25 U.S.C. § 3002(a)(1). In cases in which the lineal descendants cannot be ascertained, or which involve unassociated funerary objects, sacred objects, and objects of cultural patrimony, NAGPRA develops a scheme for determining which tribe has the closest relationship, and hence the strongest entitlement, to the items, based on geographic and cultural factors. *See* 25 U.S.C. § 3002(a)(2). The regulations require federal agency officials to determine who is entitled to custody of the cultural items, and set forth procedures for the notification of potential lineal descendants and interested tribes. *See* 43 C.F.R. § 10.6.

The intentional excavation or removal of Native American human remains and objects from federal or tribal lands is governed by NAGPRA. NAGPRA does not permit such excavation or removal unless the items are removed or excavated pursuant to a permit issued under the ARPA, 16 U.S.C. §§ 470aa–470mm. *See* 25 U.S.C. § 3002(c)(1)[3]. It also prohibits the inten-

---

**3.** NAGPRA provides specific requirements that must be met prior to intentional excavation or removal of Native American human remains and objects:

The intentional removal from or excavation of Native American cultural items from Federal or tribal lands for purposes of discovery, study, or removal of such items is permitted only if—

(1) such items are excavated or removed pursuant to a permit issued under section 470cc of Title 16 which shall be consistent with this Chapter;

(2) such items are excavated or removed after consultation with or, in the case of tribal lands, consent of the appropriate (if any) Indian tribe ...;

(3) the ownership and right of control of the disposition of such items shall be as provided in subsections (a) and (b) of this section; and

tional excavation or removal of Native American cultural items from Federal lands prior to consultation with or, in the case of tribal lands, without the consent of, the appropriate Indian tribe, and proof of such consultation or consent. *See* 25 U.S.C. § 3002(c)(2), (4). The implementing regulations of NAGPRA set forth detailed procedures for consulting with Indian tribes in the event of an intentional excavation or removal. *See* 43 C.F.R. §§ 10.3(b), 10.5. Section 3002(a), discussed above, governs the ownership and control of Native American cultural items that are intentionally excavated or removed.

In addition to intentional excavation and removal, NAGPRA governs the inadvertent discovery of Native American cultural items on federal or tribal lands:

> Any person who knows, or has reason to know, that such person has discovered Native American cultural items on Federal or tribal lands after November 16, 1990, shall notify, in writing, the Secretary of the [Interior], or head of any other agency or instrumentality of the United States, having primary management authority with respect to Federal lands and the appropriate Indian tribe ... with respect to tribal lands, if known or readily ascertainable.... If the discovery occurred in connection with an activity, including (but not limited to) construction, mining, logging, and agriculture, the person shall cease the activity in the area of the discovery, make a reasonable effort to protect the items discovered before resuming such activity, and provide notice under this subsection. Following the notification under this subsection and upon certification by the Secretary of the [Interior] or the head of any agency or instrumentality of the United States or the appropriate

Indian tribe ... that notification has been received, the activity may resume after 30 days of such certification.

25 U.S.C. § 3002(d)(1) (2001). As with Native American cultural items intentionally excavated or removed, cultural items that are inadvertently discovered are subject to the ownership and control provisions of 25 U.S.C. § 3002(a).

In addition to requiring the discoverer to report the inadvertent discovery of Native American cultural items, the regulations implementing § 3002(d) impose six additional obligations on responsible federal agency officials who receive notification that Native American cultural remains have been inadvertently discovered on federal lands. Having received notification of the State's inadvertent discovery and being the responsible federal agency, Corps officials must, within three working days from notification: (1) certify receipt of the notification; (2) take immediate steps, if necessary, to further protect the cultural items, including, as appropriate, stabilization or covering; (3) notify Indian tribes that may be entitled to ownership or control of the cultural items under the Act; (4) initiate consultation on the inadvertent discovery pursuant to 43 C.F.R. § 10.5 (governing consultation with Indian tribes); (5) follow the provisions of 43 C.F.R. § 10.3(b) (governing intentional excavation or removal) if the cultural items must be excavated or removed; and (6) ensure that the disposition of the cultural items is carried out following 43 C.F.R. § 10.6 (governing custody of Native American cultural items). *See* 43 C.F.R. § 10.4(d)(1).

Plaintiffs contend defendants removed Native American cultural items from location A on May 20 and 23, 2002, without complying with the notification and consul-

---

(4) proof of consultation or consent under paragraph (2) is shown.

25 U.S.C. § 3002(c).

tation requirements of 25 U.S.C. § 3002(c)(2–4), 43 C.F.R. §§ 10.3, 10.4 and 10.5, and without obtaining a permit under the ARPA as required in 25 U.S.C. § 3002(c)(1). Although plaintiffs refer to "consent" as being a requirement before removal, the cultural items at issue in this action were not located on tribal lands. Thus, the requirement of consent in 25 U.S.C. § 3002(c)(2) does not apply in this case. Plaintiffs further contend that the provisions governing inadvertent discoveries of Native American cultural items were violated because the State did not cease construction activity at location A for 30 days following the discovery of human remains.

■ One issue that must be addressed is whether NAGPRA applies to the lands at issue in this action. The remains were found on lands that have now been transferred to the State of South Dakota pursuant to the Water Resources Development Act of 1999 ("WRDA"). *See* Pub.L. No. 106–53, 113 Stat. 391–93 (Aug. 17, 1999) (as amended Pub.L. No. 106–541, § 540, 114 Stat. 2665 (December 11, 2000)). The WRDA, as amended, required the Secretary of the Army to transfer the relevant lands to the Secretary of the Department of Game, Fish and Parks for the State of South Dakota on or before January 1, 2002. *Id.* The WRDA explicitly provides that NAGPRA continues to apply to the lands at issue. *See id.* at § 605(h)[4]. Pursuant to WRDA, the land and recreation areas, including the North Point area relevant in this action, was transferred in Feb-

ruary 2002 to the Department of Game, Fish and Parks of the State of South Dakota "for fish and wildlife purposes, or public recreation uses, in perpetuity." *Id.* § 605(a)(1)(A). The State of South Dakota and the Corps entered a written agreement recognizing that "the Federal Government will have the ultimate responsibility for ensuring that historical and cultural resources in and on these lands are protected." (Am.Comp.Ex.7.) In the written agreement, the Corps and the State agreed that notwithstanding the transfer of lands to the State, "[t]he Corps will retain, and will exercise, all authority, jurisdiction, and powers of approval regarding the National Historic Preservation Act (NHPA), the Native American Graves Protection and Repatriation Act (NAGPRA), and the Archaeological Resource Protection Act (ARPA) that it held prior to the mentioned transfer regarding activities that take place partially or wholly within the transferred lands." (*Id.*) Thus, NAGPRA applies to locations A, B and C where human remains were inadvertently discovered on May 14, 2002.

■ Based upon the record before the Court, it appears that, although it has not been formally determined, there is a high likelihood that the remains discovered at location A on May 14, 2002 and June 4, 2002, are "Native American cultural items" protected by 25 U.S.C. § 3002(d). Despite the Tribe's claim that the discovery on May 14, 2002 should have been foreseen by the defendants, Eric Adamson's discovery

---

4. Section 605(h) of the Water Resources Development Act of 1999 provides that:

    APPLICABILITY OF LAW.—Notwithstanding any other provision of this Act, the following provisions of law shall apply to land transferred under this section:
      (1) The National Historic Preservation Act (16 U.S.C. 470 et seq.), including sections 106 and 304 of that Act (16 U.S.C. 470f, 470w–3).

(2) The Archaeological Resources Protection Act of 1979 (16 U.S.C. 470aa et seq.), including sections 4, 6, 7, and 9 of that Act (16 U.S.C. 470cc, 470ee, 470ff, 470hh).
(3) The Native American Graves Protection and Repatriation Act (25 U.S.C. 3001 et seq.), including subsections (a) and (d) of section 3 of that Act (25 U.S.C. 3003).
Pub.L. No. 106–53, 113 Stat. 393.

of the remains constitutes an "inadvertent discovery" of human remains. The regulations define an inadvertent discovery as "the unanticipated encounter or detection of human remains, funerary objects, sacred objects, or objects of cultural patrimony found under or on the surface of Federal or tribal lands." 43 C.F.R. § 10.2(g)(4). The Tribe has argued that the discovery on May 14, 2002 was not inadvertent because various members of the Tribe have repeatedly informed Corps' officials of the Tribe's oral history that burial grounds are located along the Missouri River at several locations including North Point. Barnum admitted being informed of the Tribe's oral history. Nevertheless, Eric Adamson's discovery qualifies as an inadvertent discovery rather than an intentional excavation. The regulations define an intentional excavation as "the planned archeological removal of human remains, funerary objects, sacred objects or objects of cultural patrimony found under or on the surface of Federal or tribal lands." 43 C.F.R. § 10.2(g)(3).

■ The first duty imposed on the Corps is one of certification relating to the inadvertent discovery. *See* 43 C.F.R. § 10.4(d)(1)(i). Because the remains were discovered on previously owned federal land to which NAGPRA continues to apply by statute, the persons who discovered them were required to "provide immediate telephonic notification of the inadvertent discovery, with written confirmation, to the responsible Federal agency official." 43 C.F.R. § 10.4(b). The purpose of this requirement is to ensure that the government receives timely, reliable notice from persons who have discovered Native American cultural items. Because the Corps received such notice on May 15, 2002 when Schneider reported his observations at location A to Barnum, it is not necessary to go through the formality of requiring Schneider ·or any other State employee to write down what they saw.

The Corps was required to "certify" its receipt of notification. 43 C.F.R. § 10.4(d)(1)(i). This certification, which is not required to be written, simply acknowledges receipt of the discoverer's notification. Barnum· clearly did so in her oral communications with Schneider and Corey on May 15, 2002 and during her visit to the site on May 20, 2002.

■ The Corps' second duty is to "[t]ake immediate steps, if necessary, to further secure and protect inadvertently discovered human remains, funerary objects, sacred objects, or objects of cultural patrimony, including, as appropriate, stabilization or covering." 43 C.F.R. § 10.4(d)(1)(ii). The Corps contends that removal of the loose and scattered human remains and artifacts from location A on May 20 and 23 was to "protect" them under § 10.4(d)(1)(ii) and that the provisions of § 10.3 relating to intentional excavation or removal do not apply in this situation. The Court disagrees. The types of protection contemplated by § 10.4(d)(1)(ii) are "stabilization or covering" rather than removal. Significantly, if excavation or removal is required § 10.4(d)(1)(v) specifically provides that the requirements and procedures in § 10.3(b) must be followed, including consultation with appropriate Indian tribes.

The situation in the present case is unlike the situation in *Yankton Sioux Tribe v. United States Army Corps of Engineers,* 83 F.Supp.2d 1047, 1058 (D.S.D. 2000) (*Yankton I,*) where "immediate removal [was] necessary to protect the loose remains" because the flooding of the area would probably have washed at least some of the remains away. The Court found in *Yankton I* that NAGPRA's "provisions protecting Native American cultural items take precedence over its provisions requiring consultation with Indian tribes" in light of the immediacy of the situation present-

ed there. *Id.* at 1058–59. Here, however, the situation did not present an emergency preventing the Corps from consulting with the Tribe and any other appropriate Indian tribe prior to removal of the remains on May 20 and 23, 2002. Rather, Barnum could have mapped the area, covered the remains with surrounding dirt and initiated the consultation required by 43 C.F.R. § 10.3(b).

The reason advanced by Barnum for removing the remains was to protect them from theft. The danger of theft equally applied to the embedded remains at location A, but Barnum did not find it necessary to excavate or remove those remains on May 20 or 23, 2002. The Court does not find that a generalized fear of theft is sufficient to overcome the Corps' responsibility to comply with § 10.3(b). *See* 43 C.F.R. § 10.4(d)(1)(v) (requiring that "[i]f the human remains ... must be excavated or removed, [the responsible Federal agency official must] follow the requirements and procedures in § 10.3(b)"); *cf. Yankton I*, 83 F.Supp.2d at 1058–59 (finding that the immediacy of the situation required removal of the remains before initiating consultation under §§ 10.4(d)(1)(v) and 10.3(b)). If a generalized fear of theft was sufficient, there would be few, if any, situations in which the Corps would be required to comply with § 10.3(b), because there will almost always be a risk of theft with regard to inadvertently discovered Native American cultural items.

The third duty imposed on the Corps is to "notify by telephone, with written confirmation," the Indian tribes likely to be culturally affiliated with the inadvertently discovered human remains, the Indian tribe which aboriginally occupied the area, and any other Indian tribe that is reasonably known to have a cultural relationship to the human remains." 43 C.F.R. § 10.4(d)(1)(iii). In this case, based upon the record, the Tribe qualifies as an Indian tribe "likely to be culturally affiliated with the inadvertently discovered human remains [and] funerary objects." *Id.* Barnum clearly has an obligation under 43 C.F.R. § 10.4(d)(1)(iii) to at least notify the Tribe of the inadvertent discovery of human remains and funerary objects on May 20 and 23, 2002. She did not so notify the Tribe.

Despite Barnum's failure to provide the Tribe with written notice, the State through its letter of May 24, 2002, did provide such written notice. In addition, Janis began attempts to orally notify the Tribe during the week of May 27, 2002. While a preliminary injunction will not remedy the lack of notice as to the inadvertent discovery on May 14, 2002, that lack of notice may support the issuance of a permanent injunction regarding the notice requirements. In any event, the Corps' failure to provide such notice to the Tribe does not extend the 30–day cessation of activity in 25 U.S.C. § 3002(d)(1). The statutory thirty-day cessation of activity dates from the time of certification to the person who discovered the remains, not from the time the Tribe received notice. *See* 25 U.S.C. § 3002(d)(1) ("the activity may resume after 30 days of such certification"); 43 C.F.R. §§ 10.4(c), (d)(2).

The Corps' fourth duty is to initiate consultation on the inadvertent discovery pursuant to the procedures set forth in 43 C.F.R. § 10.5. *See* 43 C.F.R. § 10.4(d)(1)(iv). Janis testified to his efforts to orally consult with various Indian tribes regarding the inadvertent discovery. There was no testimony, however, that Janis or any other Corps official has complied with the requirements of § 10.5(b–d). Moreover, no evidence was introduced demonstrating that Janis or any other Corps official satisfied the duty to consult with appropriate Indian tribes in written form. *See* 43 C.F.R.

§ 10.5(b)(1–2), (c). One of the arguments advanced by the Corps for not consulting the Tribe prior to removal of the human remains and funerary objects on May 20 and 23, 2002, was that Barnum had not yet determined whether these items were Native American. The Court does not find this argument credible in light of Barnum's knowledge of the Tribe's claims that their ancestors are buried in the North Point area. At the very least the Tribe is an Indian tribe "likely to be, culturally affiliated with the human remains [and] funerary objects" inadvertently discovered in May 2002. 43 C.F.R. § 10.5(a)(2). Another Corps official, Janis, readily recognized that the Corp should consult with the Tribe, but the current record does not establish that the requirements for such consultation were met here. *See* 43 C.F.R. §§ 10.4(d)(1)(iv) and 10.5(b–c).

The fifth duty involves the May 20 and 23, 2002 intentional removal of the inadvertently discovered remains. The Corps' interpretation advanced in this action is that it is not required to comply with § 10.3(b) because the discoveries at issue in this lawsuit are inadvertent discoveries governed by § 10.4. As explained above, however, § 10.4 governing inadvertent discoveries explicitly incorporates the requirements of § 10.3(b) if the inadvertently discovered remains must be excavated or removed. *See* 43 C.F.R. § 10.4(b)(1)(v). Thus, the Corps must comply with § 10.3(b) before intentionally excavating or removing any of the inadvertently discovered remains at North Point, including in the almost certain future situations where additional Native American cultural items are inadvertently discovered. The affidavits of Chytka and Spotted Eagle offered in support of the motion for preliminary injunction demonstrate that the Corps is continuing to fail in its obligation to comply with 43 C.F.R. § 10.3(b) in relation to

additional human remains found at North Point on June 13, 2002. (Doc. 22.)

The Corps is not in a position at this time to complete its sixth duty under 43 C.F.R. § 10.6 regarding disposition of the Native American cultural items inadvertently discovered on May 14, 2002 and thereafter. The record does not demonstrate that the Corps has formally determined that the human remains inadvertently discovered in May and June 2002 are Native American or that the Tribe is the Indian tribe entitled to custody of those cultural items. Given the evidence presented during the hearing, however, there is a high probability that the human remains discovered at location A in May and June 2002 are the Tribes' ancestors.

■ The State and Federal defendants oppose the imposition of a preliminary injunction, primarily contending that they are complying with the requirements of NAGPRA. Specifically, the State maintains that since June 6, 2002, it ceased all construction activity within 1.2 miles of location A and .38 miles of locations B and C. The construction crews were directed, on June 6, 2002, to move to this new location, identified on the attached map as "Contractor Was Directed to Work Here June 6, 2002." The Federal defendants contend that they are complying with the requirements of NAGPRA regarding notification, consultation and handling of the inadvertently discovered human remains. Thus, there is no longer a threat of irreparable harm according to the defendants. In addition, the State defendants contend they are entitled to Eleventh Amendment immunity in this action.

The Court has carefully considered and applied the balancing factors explained in *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (en banc): (1) the threat of irreparable harm to plaintiffs; (2) the state of the balance

between this harm and the injury that granting the temporary restraining order will inflict on the defendants; (3) the probability of plaintiffs' success on the merits; and (4) the public interest. The Eighth Circuit rejected a construction of the "probability of success" factor requiring that the movant prove a greater than fifty per cent likelihood that he will prevail on the merits, reasoning that:

> At base, the question [of whether preliminary relief should be granted] is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined. The equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case. Thus, an effort to apply the probability language to all cases with mathematical precision is misplaced.

*Id.* at 113. Rather, the Eighth Circuit explained that "[i]n balancing the equities no single factor is determinative." *Id.* The likelihood that the movant will prevail on the merits "must be examined in the context of the relative injuries to the parties and the public." *Id.* The Eighth Circuit provided examples of the balancing and relative importance of various factors depending upon the circumstances of the case:

> If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less.

*Id.* The Court determines that the balancing of these factors in the present case weighs in favor of the plaintiffs and a preliminary injunction will be granted.

The Court finds there is a significant threat of irreparable harm to the plaintiffs if there is further exposure of human remains or loss of remains or funerary objects from locations A, B and C. Several remains have already been removed from location A and additional remains have been observed in the immediate vicinity. There are additional human remains still embedded in the ground at location A. Given the record as it exists at this time, there is a high probability that the human remains discovered at location A in May and June 2002 are the Tribes' ancestors. If construction activities resume before plaintiffs and the Corps are able to make a reasonable effort to protect the items discovered, the human remains and funerary objects, sacred objects or objects of cultural patrimony may be irreparably damaged. *See* 25 U.S.C. § 3003(d)(1), 43 C.F.R. § 10.4(c), (d)(1). There is evidence in the record that demonstrates human remains have been crushed from the construction activities at North Point. At the time of the temporary restraining order hearing, the State defendants contended that there was no need for a temporary restraining order because all construction activities had ceased within 1.2 miles of location A and .38 miles of locations B and C. In addition to ceasing activities, the State defendants represented that twenty-four hour law enforcement was in place to protect location A. The State's act of providing law enforcement has lessened the likelihood of irreparable harm, but considering the importance of the human remains and artifacts to the plaintiffs, the threat of irreparable harm remains high.

Having considered the balance of the harm between the parties the Court finds that this factor tips in favor of plaintiffs on the record currently before the Court.

The harm to plaintiffs is high given the sensitive nature of the subject of this action. NAGPRA was enacted to provide relief to Indian peoples for the type of harm these plaintiffs are suffering. The State defendants have already ceased construction activities at location A and have directed the construction crew to work in an area 1.2 miles away from location A and .38 miles from locations B and C. Location A was being used solely to obtain fill dirt. The evidence in the record demonstrates that the State has directed Adamson to another location to obtain fill dirt. Moreover, the Court would be willing to consider altering the preliminary injunction as to locations B and C prior to a trial on the merits in the event the earth moved to those locations from location A is examined and is determined to not contain Native American cultural items. The issuance of a preliminary injunction would inflict minimal harm to the State defendants' construction activities. Moreover, requiring the Federal defendants to comply with their obligations under NAGPRA will not inflict any additional obligations on them. This factor weighs in favor of plaintiffs.

While the Court found, based upon the record relating to the motion for temporary restraining order, that the probability for success on the merits relating to the NAGPRA claim was modest, a more thorough consideration of NAGPRA and its implementing regulations as well as the additional information submitted on the preliminary injunction motions convinces the Court that plaintiffs may well prevail on at least some of their NAGPRA claims. As fully explained above in evaluating the Corps' duties under NAGPRA in this case, the Corps' interpretation that it need not comply with the provisions of 25 U.S.C. § 3002(c) and 43 C.F.R. § 10.3(b) for intentional excavation or removal of Native American cultural items inadvertently discovered at North Point in May and June 2002 is erroneous. *See* 43 C.F.R. § 10.4(d)(1)(v). If it is shown at trial that the Corps has failed to comply with these provisions of NAGPRA and its implementing regulations, plaintiffs may be entitled to permanent injunctive relief. *See* 25 U.S.C. § 3013 (providing that United States district courts "shall have jurisdiction over any action brought by any person alleging a violation of [NAGPRA] and shall have authority to issue such orders as may be necessary to enforce the provisions of [NAGPRA].""). In addition, while the Court accepts the Corps' view that "consultation," as required by NAGPRA and its implementing regulations, does not require the Corps to obtain the appropriate Indian tribes' *consent* to intentionally excavate or remove Native American cultural items, it is clear that the consultation must be meaningful and conducted in good faith by the Corps in light of the Federal Government's unique relationship to Indian tribes. *See* 25 U.S.C. § 3010 (recognizing that NAGPRA reflects the "unique relationship between the Federal Government and Indian tribes").

Although the Federal defendants continue to argue the plaintiffs' probability for success on the merits of plaintiffs' non-NAGPRA claims is low, the merits of the non-NAGPRA claims will, again, not be evaluated at this point in the proceeding because the preliminary injunction relates only to plaintiffs' NAGPRA claims. *See, e.g., Iowa Right to Life Committee, Inc. v. Williams,* 187 F.3d 963 (8th Cir.1999) (evaluating the probability of success on the merits of only the claims for which the non-movant sought to challenge the grant of a preliminary injunction, rather than all of the claims in the action); *Mutual of Omaha Ins. Co. v. Novak,* 775 F.2d 247, 248 (8th Cir.1985) (considering only the claims reached by the district court in granting the preliminary injunction in evaluating the movant's probability of success on the merits).

In this case, plaintiffs have "raised questions so serious and difficult as to call for more deliberate investigation." *Dataphase*, 640 F.2d at 113. Additional evidence will need to be evaluated to determine whether NAGPRA has been complied with and, if not, whether plaintiffs are entitled to a permanent injunction for any such non-compliance. Given the state of the record, and the unresolved factual issues relating to compliance with NAGPRA and its implementing regulations, the Court finds that the probability of success factor is neutral for purposes of the *Dataphase*, balancing test.

As to the public interest factor, the Court concludes it weighs in favor of protecting the Native America cultural items as Congress directed in NAGPRA. The North Point Public Recreation Area has existed for a long time without the expanded facilities and there will not be any major impact if the project is slowed down for a period of time. Given the plaintiffs' beliefs about their ancestors and how disturbance of their ancestors' remains affects plaintiffs' lives, the public interest factor weighs in favor of plaintiffs, at least to the point of protecting the status quo. Moreover, it is clearly within the public interest to require compliance with NAGPRA and its implementing regulations.

Weighing the *Dataphase* factors, three factors weigh in favor of plaintiffs and the probability of success factor is neutral. Plaintiffs have raised a substantial question regarding their NAGPRA claims and the equities are otherwise strongly in their favor. *See Dataphase*, 640 F.2d at 113. Not all of plaintiffs' requests, however, will be granted.

Plaintiffs' request that the remains being stored at the State Archeological Resources Center in Rapid City be returned to location A will be denied at this time. Requiring defendants to return these remains would require affirmative action,

for which plaintiffs carry a heavier burden of persuasion on the *Dataphase* factors. *See Ferry–Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir.1984); *Calvin Klein Cosmetics Corp. v. Lenox Labs. Inc.*, 815 F.2d 500, 503 (8th Cir. 1987); *Green Products Co. v. Independence Corn By–Products Co.*, 992 F.Supp. 1070, 1074 (N.D.Iowa 1997). There are no provisions in NAGPRA or the implementing regulations requiring the return of Native American cultural items to the site of an inadvertent discovery in the event the regulations' notification, consultation or other requirements are not satisfied. Moreover, the Corps cannot transfer custody of the cultural items at issue to the Tribe before complying with the provisions of 43 C.F.R. § 10.6. The heavier burden has not been met here in light of the custody provisions in 43 C.F.R. § 10.6.

While the Court will not enter a preliminary injunction requiring the Federal defendants to return the human remains and funerary objects to location A, the Court will require that the Corps comply with the provisions of 25 U.S.C. § 3002(c) and 43 C.F.R. § 10.3(b) for intentional excavation or removal of any Native American cultural items after June 28, 2002, that were or may be thereafter inadvertently discovered at North Point. In addition, the Court will order that the Corps expeditiously and formally determine whether the human remains and other funerary objects inadvertently discovered at North Point are Native American cultural items as defined by 25 U.S.C. § 3001(3), (9) and if so, which Indian tribe is culturally affiliated with those items.

Plaintiffs' request that the Court order the State defendants to continue providing security at location A also requires plaintiffs to meet a heavier burden because the request entails affirmative action by the State defendants. That burden has not

been met here and the motion will be denied as to this request. The Court does commend the State for providing the security and hopes that it will be continued until the remains are reburied. The process necessary for a legally and culturally proper reburial should be continuing even as this lawsuit progresses. The litigation in *Yankton I*, CIV 99–4228 (D.S.D.) has been pending for some time as the parties seek an engineering and a cultural solution that are compatible and which protects remains from the forces of nature as exacerbated by dam water level variations. That factor is not present here. *Yankton I* and the present case do, however, share the problem of potential looting. Without the forces of nature problem in the present case, the present case should be promptly concluded either by decision or, hopefully, by a mutual agreement between the parties to this litigation.

Plaintiffs also request that the Court order defendants to cease all construction activity at locations A, B and C. This portion of the motions for preliminary injunction will be granted based upon the Court's weighing of the *Dataphase* factors explained above. The record demonstrates that an archeologist hired by the State is currently examining the earth at locations B and C. Examination by the State archeologist has also been done with the assistance of a metal detector. While none of the topsoil was taken to locations B and C, the evidence is not clear that all of the remains were found in the topsoil. The record does not demonstrate that the borrow material from location A that was placed at locations B and C does not contain human remains. Thus, the Court will order that no further excavation, building or other construction activities be conducted at locations A, B and C until the earlier of four events: (1) it has been established to the Court that the human remains and funerary objects inadvertently discovered in May and June 2002 are properly buried according to law and the customs of the peoples culturally affiliated with those remains and objects; (2) the Court alters the preliminary injunction in light of information that may be submitted by the defendants demonstrating that construction activities at location A will not cause damage to as yet undiscovered Native American cultural items in the area where Native American cultural items were inadvertently discovered on May 14, 2002 and thereafter and that the fill dirt from location A that was placed at locations B and C has been thoroughly examined and does not contain any Native American cultural items as defined in 25 U.S.C. § 3001(3), (9); (3) the parties negotiate an alternative to this preliminary injunction and it is approved by the Court; or (4) the Court issues a decision on the merits of plaintiffs' request for a permanent injunction as to the issues addressed in this preliminary injunction. The other issues raised in this litigation can be decided after the human remains and funerary objects have been properly reburied. This may necessitate a bifurcated trial on the permanent injunction issues. The first trial on the permanent injunction will consider the more limited issues that are addressed in this preliminary injunction. In this first trial on the preliminary injunction issues, the plaintiffs should address, among other things, the proposed development by the Tribe, since abandoned, that was described in the documents disclosed for the first time to the Court by the State of South Dakota.

The Court notes that all persons conducting construction activities at North Point must comply with NAGPRA as to *each* inadvertent discovery of Native American human remains, funerary objects, sacred objects, or objects of cultural patrimony. In addition, *each* inadvertent discovery of Native American cultural items will require compliance with the pro-

tection, notification, certification and consultation duties imposed by NAGPRA and its implementing regulations.

There was testimony that a tribal member, Glenn Drapeau, was prevented from accessing location A for religious purposes. Thus, the Court will order that none of the Tribe's members be prevented from accessing locations A, B and C for religious reasons.

The State defendants raised the issue of Eleventh Amendment immunity in their brief and argument in opposition to the motion for temporary restraining order. The issue of whether the State of South Dakota is entitled to Eleventh Amendment immunity in this action will not be decided at this stage in the proceedings. The Court does, however, make a preliminary finding that prospective injunctive relief may be granted pursuant to *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), against John Cooper, in his official capacity as the Secretary of the Department of Game, Fish and Parks for the State of South Dakota. The Eighth Circuit explained that:

> *Ex parte Young* and its progeny teach that a private party may seek prospective injunctive relief in federal court against a state official, even if the state is otherwise protected by Eleventh Amendment immunity.

*Randolph v. Rodgers*, 253 F.3d 342, 345 (8th Cir.2001). Thus, the Court will not issue the preliminary injunction against the State of South Dakota, but the order will be issued against John Cooper, in his official capacity. Accordingly,

IT IS ORDERED:

1. That plaintiffs' Motions for Preliminary Injunction, Docs. 8 and 22 are granted in part to the extent set forth in paragraphs 2, 3, and 4 and are denied in all other respects.

2. That the Preliminary Injunction as stated in paragraph 3 is effective until the earlier of the following four events: (1) it has been established to the Court that the human remains and funerary objects inadvertently discovered in May and June 2002 are properly buried according to law and the customs of the peoples culturally affiliated with those remains and objects; (2) the Court alters the preliminary injunction in light of information that may be submitted by the defendants demonstrating that construction activities at location A will not further damage the area where Native American cultural items were inadvertently discovered on May 14, 2002 and thereafter and that the fill dirt from location A that was placed at locations B and C has been thoroughly examined and does not contain any Native American cultural items, as defined in 25 U.S.C. § 3001(3), (9); (3) the parties negotiate an alternative to this preliminary injunction and it is approved by the Court; or (4) the Court issues a decision on the merits of plaintiffs' request for a permanent injunction.

3. That John Cooper, in his official capacity as the Secretary of the Department of Game, Fish and Parks for the State of South Dakota, and his officers, agents, servants, employees, attorneys, and persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise, are preliminarily enjoined from: (a) conducting any excavation, building or other construction activities at the North Point Recreation Area locations marked as "A," "B," and "C" on the map attached to this Order; and (b) excluding any member of the Yankton Sioux Tribe who, for religious purposes, requests access to the North Point Recreation

Area locations marked as "A," "B," and "C" on the map attached to this Order.

4. That the United States Army Corps of Engineers and Thomas E. White, Secretary of the Army, Dominic Izzo, Principal Deputy Assistant Secretary of the Army for Civil Works, Robert E. Flowers, Chief of Engineers, Curt F. Ubbelohde, Omaha District Commander and District Engineer, and their officers, agents, servants, employees, attorneys, and persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, are preliminarily ordered to: (1) comply with the provisions of 25 U.S.C. § 3002(c) and 43 C.F.R. § 10.3(b) for intentional excavation or removal of Native American cultural items inadvertently discovered at North Point; (2) expeditiously and formally determine whether the human re- mains and other funerary objects inadvertently discovered at North Point are Native American cultural items as defined by 25 U.S.C. § 3001(3), (9) and if so, which Indian tribe is culturally affiliated with those items.

5. That the Court will not require the Yankton Sioux Tribe or its members to post security or bond under Fed. R.Civ.P. 65(c).

6. That the Court directs the parties to consider engaging in mediation in an effort to resolve the dispute which is the subject of this Memorandum Opinion and Order. The parties may use a mediator of their choice. Magistrate Judge John Simko is also available to the parties for mediation.

7. The plaintiffs' Motion to Consider Additional Evidence, Doc. 28, is granted.

ATTACHMENT